**LEE BEVERAGE COMPANY, INC., a Wisconsin corporation, Plaintiff,**

v.

**I.S.C. WINES OF CALIFORNIA, INC., a foreign corporation, and United Vintners, Inc., a foreign corporation, Defendants.**

No. 83–C–1882.

United States District Court, E.D. Wisconsin.

Nov. 27, 1985.

James J. Williamson, Dempsey, Magnusen, Williamson & Lampe, Oshkosh, Wis., for plaintiff.

Carol S. Josten, Godfrey & Kahn, S.C., Milwaukee, Wis., for I.S.C. Wines.

Charles P. Graupner, Michael, Best & Friedrich, Milwaukee, Wis., for Vintners, Inc.

## ORDER

WARREN, District Judge.

This action involves alleged violations of the Wisconsin Fair Dealership Law ("WFDL"), Chapter 135, Wisconsin Statutes. The plaintiff, Lee Beverage Company, Inc. ("Lee"), has claimed that the defendants, I.S.C. Wines of California, Inc. ("I.S.C. Wines") and United Vintners, Inc. ("United"), terminated, cancelled or substantially changed the plaintiff's distributorship of wines and brandies without good cause in violation of Wis.Stat. § 135.03. The plaintiff has further alleged that the defendants violated the notice requirements set forth in Wis.Stat. § 135.04. As recompense, the plaintiff requests both damages and injunctive relief.

By stipulation of the parties and order of the Court dated November 16, 1984, all claims against I.S.C. Wines have been dismissed. Now pending before the Court is United's motion for summary judgment as to the claims against it. The Court has reviewed the submissions of the parties with respect to this motion as well as other documents of record in this case, and finds that no material issues of fact are in dispute. Accordingly, the Court will proceed to resolve the legal issues presented.

## BACKGROUND

This action arises out of a distributorship agreement entered into between Lee Beverage and United Vintners in April of 1980. United, a Connecticut corporation, is in the business of manufacturing, distributing and importing wine and other alcoholic beverages. Lee Beverage is a Wisconsin corporation that distributes wine, liquor, and beer. Their agreement granted Lee an exclusive distributorship of certain wines and brandies sold by United within a specified portion of Wisconsin. Lee proceeded to do so for approximately three and one-half years, during which time it expended time and money establishing and maintaining a market for the beverages it distributed.

In July, 1983, United agreed to sell some of its product lines to I.S.C. Wines of California, Inc. Among the product lines sold to I.S.C. Wines were some of those distributed by Lee in Wisconsin. On or about October 3, 1983, Lee received written notice from I.S.C. Wines that, as of September 28, 1983, I.S.C. Wines would select distributors for its new product lines and that Lee would not be among those selected. Lee did not receive any notice from United that its distributorship would be terminated. In fact, Lee continued to distribute certain product lines for United which had not been sold to I.S.C. Wines.

### I. Was Lee's Distributorship Terminated By United Without Good Cause?

Lee contends that United terminated or substantially changed its distributorship agreement with Lee without good cause in violation of Wis.Stat. § 135.03. United argues that the Wisconsin Fair Dealership Law does not apply to a non-discriminatory withdrawal from a product marketed in a large geographic area. United claims that its decision to sell certain of its product lines to I.S.C. Wines was based solely on economic considerations, and that the alter-

ation of the distributorship agreement was a consequence of this sale.

There is no dispute between the parties that Chapter 135 governs the dealership agreement entered into between them. The parties do disagree as to whether Chapter 135 and, in particular, § 135.03 precludes the termination or alteration of a dealership agreement in the circumstances described above.

Section 135.03 provides that:

No grantor, directly or through any officer, agent or employe, may terminate, cancel, fail to renew or substantially change the competitive circumstances of a dealership agreement without good cause. The burden of proving good cause is on the grantor.

In *St. Joseph Equipment v. Massey-Ferguson, Inc.*, 546 F.Supp. 1245 (W.D.Wis.1982), the question presented was whether the prohibition in § 135.03 applied where the defendant grantor had terminated the plaintiff's dealership of construction machinery by discontinuing, for economic reasons, its marketing of construction machinery in North America, the geographic area over which the plaintiff held dealership rights. The court held that § 135.03 did not apply "in cases where … the grantor undertakes a non-discriminatory withdrawal from a product market on a large geographic scale." 546 F.Supp. at 1247. In so holding, the court pointed out the absurdity of compelling a grantor to continue marketing an unprofitable product line in a geographic area simply to effectuate a dealership agreement. Such a result would frustrate the corporate grantor's purpose in entering into a dealership arrangement in view of the ultimate objective of the corporation, which is to obtain a profit. The court concluded that "good cause" for the termination of a dealership could be found based upon the business motives of the grantor without reference to the performance of the dealer. 546 F.Supp. at 1247–1248.

This Court fully agrees with the analysis and result in the *St. Joseph* case. The Wisconsin Fair Dealership Law was intended to protect dealers from unjustified, imperious acts on behalf of economically superior grantors. The law was not intended to compel the perpetuation of a business relationship when, for sound financial reasons, a grantor determines that the sales of its product over a wide geographic area are no longer a profitable venture.

■ The plaintiff's argument that *St. Joseph* should be distinguished from the present case because the defendant here did not terminate or alter the dealership agreement due to economic necessity must be rejected. "Good cause" for a dealership termination need not be found only when the continuation of a dealership arrangement would mean financial ruin for the grantor. The reasoning expressed in *St. Joseph* applies equally well to a situation where the profitability of wide-scale sales of a product line has sunk to such a point that a sale or discontinuation of the product line is justified for the good of the corporation. A law which required otherwise would no doubt be subject to legitimate attack on the basis of constitutional principles.[1]

---

1. The defendant argues in its reply brief that if § 135.03 is interpreted in such a way as to preclude a grantor from withdrawing its product from a wide-scale geographic area in a non-discriminatory manner for financial reasons, then the statute would violate the Commerce Clause of the United States Constitution. In addition to other constitutional infirmities which have been alleged in connection with the WFDL, this Commerce Clause argument has also been raised before. In *C.A. May Marine Supply Co. v. Brunswick Corp.*, 557 F.2d 1163, 1167 (5th Cir.1977), the Fifth Circuit declared that this Commerce Clause argument, along with the other due process, Supremacy Clause and vagueness arguments raised, was "patently frivolous." The court reasoned that no Commerce Clause violation could occur when grantors became subject to the provisions of this law due only to their "contractual consent." *Id.*

While the Court does not intend to delve unnecessarily into this constitutional quagmire, and by no means wishes this footnote to be construed as its opinion on the constitutionality of § 135.03, it does believe that the Fifth Circuit's rather attenuated analysis leaves much to be desired. If it is assumed that a grantor that establishes a dealership arrangement in Wisconsin voluntarily submits itself to the constraints

■ On the other hand, the present situation is distinguishable from that in *Kealey Pharmacy & Home Care Serv. v. Walgreen Co.*, 539 F.Supp. 1357 (W.D.Wis. 1982), *aff'd in part*, 761 F.2d 345 (7th Cir.1985). In *Kealey*, the district court held and the Court of Appeals agreed that a grantor which terminated its dealership agreement with several independently owned pharmacies in favor of maintaining and increasing the number of its own stores in the same marketing area did so in violation of § 135.03. The grantor in *Kealey* continued to sell the same product line; albeit through a different network: its own stores as opposed to the pharmacies which had developed the market. In this case, there was no such shift of the product lines from one distributor to another. Rather, the grantor ceased selling the product lines at issue altogether.

Although the Court does not believe that such a discontinuation in the marketing of product lines is necessary in order to meet the good cause standard in § 135.03, the fact that the product lines in question in this case were not simply switched from some distributors to others is an important consideration in light of the purpose of the WFDL (discussed below). This fact also makes this case distinguishable from the situation in *Kealey*.

The Court is cognizant of the language in both the district court's and circuit court's decisions in *Kealey* concerning the limited meaning of the term "good cause" as it is used in the WFDL. The Court concedes that the definition of "good cause" in § 135.02(4) pertains exclusively to the performance or acts of the dealer without reference to the economic concerns of the grantor.[2] However, such a literal reading of the statute would not comport with the intentions of the legislature as expressed in § 135.025 which reads, in part, as follows:

(1) This chapter shall be liberally construed and applied to promote its underlying remedial purposes and policies.

(2) The underlying purposes and policies of this chapter are:

(a) To promote the compelling interest of the public in fair business relations between dealers and grantors, and in the continuation of dealerships on a fair basis;

(b) To protect dealers against unfair treatment by grantors, who inherently have superior economic power and superior bargaining power in the negotiation of dealerships;

(c) To provide dealers with rights and remedies in addition to those existing by contract or common law;

(d) To govern all dealerships, including any renewals or amendments, to the full extent consistent with the constitutions of this state and the United States ...

Apart from the constitutional concerns expressed above, a statute which required a grantor to maintain a dealership arrangement in spite of the economic consequences to itself could hardly be characterized as a law that promoted the "compelling interest of the public in fair business relations", or one which promoted the "continuation of dealerships on a fair basis." § 135.025(2)(a). In order to effect the purpose of the legislature in enacting the WFDL, the term "good cause" must be interpreted more liberally in this situation than it was

---

of the WFDL, then the obvious implication is that a reasonable alternative to that voluntary action must exist. The only alternative apparent to this Court is a decision not to market a product through dealers in Wisconsin, which in most cases would be tantamount to a decision not to sell that product in Wisconsin. This may appear to be a reasonable alternative to a Court that sits in another part of the country, but it does not appear to be too reasonable to one that sits in Wisconsin.

**2.** Section 135.02(4) defines "good cause" as:

(a) Failure by a dealer to comply substantially with essential and reasonable requirements imposed upon him by the grantor, or sought to be imposed by the grantor, which requirements are not discriminatory as compared with requirements imposed on other similarly situated dealers either by their terms or in the manner of their enforcement; or

(b) Bad faith by the dealer in carrying out the terms of the dealership.

in *Kealey Pharmacy.* *See Remus v. Amo-co Oil Company,* 611 F.Supp. 885 (E.D. Wis.1985).

The materials submitted to the Court, and in particular the affidavit of Christopher Mottern, Vice-President of Finance at Heublein Wines (formerly United Vintners, Inc.), establishes that the decision to sell the product lines at issue to I.S.C. Wines was based on sound financial considerations. The decision resulted in the cessation of sales and marketing efforts by United of several of its product lines over a wide geographic area, and was not intended to affect in a discriminatory or unfair manner its distributorship agreement with Lee.

Therefore, the Court finds that United's alteration of the distributorship agreement with Lee was justified and done for good cause. Accordingly, the Court dismisses plaintiff's claim that defendant's actions violated § 135.03.

## II. Notice

■ The second issue presented by United's summary judgment motion is whether the defendant was required to give the plaintiff 90 days' written notice prior to the termination or substantial alteration of the distributorship agreement, as required by Wis.Stat. § 135.04. Section 135.04 provides, in relevant part:

> Except as provided in this section, a grantor shall provide a dealer at least 90 days' prior written notice of termination, cancellation, nonrenewal or substantial change in competitive circumstances. The notice shall state all the reasons for termination, cancellation, nonrenewal or substantial change in competitive circumstances and shall provide that the dealer has 60 days in which to rectify any claimed deficiency....

As was noted above, United never notified Lee that any alteration of the distributorship agreement was forthcoming. I.S.C. Wines notified Lee that the latter would not be selected as a distributor of I.S.C. Wines' new product lines, but this notice was received by Lee after the alteration of the distributorship agreement had been effected.

United contends that it never terminated its distributorship agreement with Lee, and that no notice by it was therefore required. The Court cannot accept this argument. Although it's true that Lee continued to distribute certain of United's product lines after the sale of others to I.S.C. Wines, that sale of a substantial number of the products formerly distributed by Lee did significantly alter the competitive circumstances of their agreement. United had no basis for assuming that I.S.C. Wines would necessarily maintain Lee as its distributor of those products, for I.S.C. Wines was not bound by any distribution agreement between United and Lee. By selling those product lines, United drastically reduced the product lines distributed by Lee in Wisconsin. The failure to give Lee notice deprived it of an opportunity to cease its market development efforts and/or look for other distributorship opportunities. In accordance with the Act's policy of insuring fairness in dealership relations, United was required to give notice to Lee as specified in § 135.04. *St. Joseph,* 546 F.Supp. at 1249.

■ Since no factual dispute exists as to whether United violated the notice provisions of § 135.04, the Court may award summary judgment to Lee with respect to its notice claim even though it has not moved for it. *Kealey Pharmacy,* 539 F.Supp. at 1370; 6 Moore's Fed. Practice, ¶ 56.12, p. 56–331–339 (2d Ed.1982). The Court believes that the plaintiff is entitled to summary judgment on that issue. The defendant is liable to the plaintiff for any damages resulting from the defendant's failure to give notice to the plaintiff of a substantial change in the competitive circumstances of their distributorship agreement as required by Wis.Stat. § 135.04.

## CONCLUSION

The Court orders that:

(1) Defendant's motion for summary judgment as to plaintiff's claim under Wis. Stat. § 135.03 be GRANTED;

(2) the plaintiff be AWARDED summary judgment with respect to its claim under Wis.Stat. § 135.04.

A subsequent proceeding will be held to determine the amount of damages to be awarded to the plaintiff.